# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **TAMI TAROCHIONE**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 1304 |
| | ) | |
| **ROBERTS PIPELINE, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Tami Tarochione ("Tarochione") has sued her former employer Roberts Pipeline, Inc. ("Roberts"), charging that Roberts violated the Americans with Disabilities Act and the Americans with Disabilities Amendments Act (collectively "ADA," 42 U.S.C. §§ 12101 et seq.), as well as Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§ 2000e et seq.),[1] by discriminating against her on the basis of disability and of sex when it fired her from her job as a laborer on a Roberts project in Mokena, Illinois. Roberts now moves for summary judgment on all counts under Fed. R. Civ. P. ("Rule") 56. Although Tarochione opposes the motion as to Title VII, she is silent as to the ADA. For the reasons set out in this opinion, Roberts' motion is granted as to Tarochione's ADA claim and is denied as to her Title VII claim.

---

[1] All further references to Title VII and the ADA will take the form "Section --," using the United States Code's Title 42 numbering rather than those statutes' internal numbering.

**<u>Factual Background</u>**[2]

What follows is a summary of the facts that are undisputed, except where noted otherwise. Tarochione, born June 7, 1959, is a member of Laborers' International Union of North America, Local 75 ("Local 75"). She has been a union laborer for some 20 years (Tarochione Dep. 9:4-9:12), and during her career she has performed physically demanding jobs such as "throwing skids" (manually unloading heavy pallets) and operating jackhammers (<u>id.</u> at 58:15-58:18). Roberts, meanwhile, is a corporation that performs pipeline maintenance and construction work (D. St. ¶ 1).

Roberts hired Tarochione in August 2012[3] through the Local 75 union hall: Roberts put in a request for a worker who met the qualifications (in terms of general experience or specific certifications) to work on a pipeline integrity project,[4] and Tarochione was assigned because she was the next available worker on Local 75's roster who had the requisite general experience as a laborer (Martin Dep. 22:7-22:23). On August 7 Tarochione began work for Roberts on a pipeline integrity digging crew near Mokena, Illinois (D. St. ¶ 3) as part of the six-member digging crew, a group that also included Curtis Fay ("Fay"), Frank Sharrard ("Sharrard") and William Dietz ("Dietz"), who also served as the Local 75 union steward (P. Resp. St. ¶¶ 11-14).

_____

[2] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion identifies Tarochione's and Roberts' respective submissions as "P." and "D." followed by appropriate designations: LR 56.1 statements as "St. ¶ --," responsive statements as "Resp. St. ¶ --," and memoranda as "Mem.--," "Resp. Mem.--" and "Reply Mem.--."

[3] All dates referred to hereafter also occurred in 2012 except where otherwise noted.

[4] Integrity digging crews uncover portions of pipeline so that the pipeline can be inspected and, if necessary, repaired (Huffman Dep. 22:21-23:1).

Joe Huffman ("Huffman") was the non-working foreman supervising the four laborers as well as two machine operators (D. St. ¶ 9). Tarochione was the only woman in the crew (P. St. ¶ 2). When she first reported to the job site, other members of the crew remarked on her small size and told her she "probably didn't weigh more than a buck 20 " and had "big shoes to fill" (Tarochione Dep. 30:11-30:19).

Tarochione and Roberts dispute what happened once she started working. Roberts asserts, and several deponents testified, that Tarochione could not control two power tools necessary for the job, an air spade and a tamper jack (D. St. ¶¶ 32, 39).[5] Roberts also states that Tarochione dug with her hands -- instead of with a shovel -- in an unsafe way (D. St. ¶¶ 23-26). Tarochione counters that she used her hands only when proper, and as for the power tools she was never given a fair opportunity to use them (P. Resp. St. ¶¶ 24-27, 32, 38). During her deposition she testified that she was allowed to use the tamper jack for only about 10 minutes before Fay took it from her (Tarochione Dep. 28:4-28:21). She did not use the air spade at all (id. at 26:20-27:7) and received no counseling in the use of the tamper jack (id. 39:13-39:21). All she received in the way of instruction came when Sharrard adjusted the tamper jack for Tarochione "a couple of times . . . so [she] could use it better" (id.). She also said that she used her hands only to remove pieces of dirt too large to remove with a shovel, and that the male workers also did that (id. 39:1-39:12). For the most part, Tarochione says, the male workers would not let her use the power tools (despite her requests to do so) and instead consigned her to

_____

[5] Air spades are air-powered tools used to strip dirt away from a pipe, and a tamper jack is similar to a jack hammer but tamps earth down with a metal disc (D. St. ¶¶ 28, 36; Tarochione Dep. 28:22-29:3). Use of a tamper jack is physically demanding, and workers on the Mokena dig earned extra pay for each day on which they used the tamper (Huffman Dep. 25:2-25:23).

cleanup and fire-watching duty (id. 26:10-26:21).  For a time she was even prevented from using a small torch necessary to melt patches of coating on the pipe (id. 27:8-27:10).

Despite all this, Tarochione avers that Sharrard told her on Friday, August 17 -- 10 days after she started -- that she was doing a "really good job" (id. 38:18-38:19).  But at some point Sharrard approached Huffman and told him that Tarochione was unable to control the power tools (Huffman Dep. 65:8-65:21).  Huffman, who stated that he had also seen Tarochione use the tamper once without being able to control it properly, decided to terminate Tarochione on Friday, August 17 (D. St. ¶ 44-45).  He testified that he made that decision because Tarochione's inability to control the tools posed a risk of rupturing the pipeline and because that inability made it harder to spread work among the digging crew members (D. St. ¶ 34; Huffman Dep. 78:17-79:11).  On that same day Huffman got in touch with an office worker at Roberts to communicate his decision to fire Tarochione and to order a final paycheck for Tarochione to pick up (D. St. ¶ 46).

Apparently on that same Friday, August 17, Sharrard and Huffman also teased Fay that he would have to quit the job if Tarochione continued working (Tarochione Dep. 62:12-62:19, 63:18-63:22).[6]  Those comments were occasioned by the fact that Fay's wife was extremely jealous and would not let him work on crews that included women (id. at 64:15-64:18).

Huffman did not tell Tarochione that she was being fired, and so Tarochione worked the next day, Saturday, August 18.  All the members of the digging crew (including Huffman and Sharrard) ate lunch together that day (id. at 34:14-19).  Fay told the group about his habit of

_____

[6]  Tarochione's deposition testimony about the teasing incident is at times hard to follow, due in part to some apparent transcription errors (see Tarochione Dep. 62:12-64:21).  But Friday seems to be the most likely reading of her statements as to the day on which the incident occurred.

drinking heavily -- a habit that included, according to Tarochione, showing up to work drunk (id. at 86:17-86:21) -- and blamed it on back pain caused by bone spurs (id. at 33:6-33:10). Tarochione responded that she had undergone shoulder replacement surgery but did not complain about the pain (id. at 33:13-33:14).

Before work started on Monday, August 20, Huffman told Dietz in the latter's capacity as union steward that Tarochione was being fired (D. St. ¶ 47; Dietz Dep. 51:16-52:8). According to Dietz, Huffman simply told him Tarochione was not "cutting it" and gave him no further explanation even when Dietz asked (Dietz Dep. 52:1-52:3). Dietz told Tarochione when she reported for work that morning that she had been fired, and he gave her her last paycheck (Dietz Dep. 53:19-54:5).

Tarochione responded by requesting that her union pursue a grievance on her behalf (P. Resp. Ex. 3).[7] She also retained a lawyer, who sent Dietz an affidavit that he in turn signed (Dietz Dep. 60:2-60:4, 61:8-61:20). Dietz's affidavit includes statements that largely support Tarochione's version of events: that her work was "just as good" as that of the male workers, that she was not given an opportunity to use the power tools and that Huffman could give only a vague reason for his decision to fire Tarochione (P. Resp. Ex. 4). During Dietz's deposition he made it clear that he was no longer able to recall the specifics about Tarochione's employment (including the quality of her work), but he did remember his conversation with Huffman (see Dietz Dep. 48:20-48:21, 51:19). Dietz did testify that he reviewed the affidavit before signing it and that the events were fresher in his memory when he did so (id. at 61:8-61:20).

---

[7] She also filed a charge with the EEOC (P. Resp. Ex. 7) and received a notice of right to sue, a copy of which was attached to the Complaint on this Court's order.

Tarochione's union did not pursue the grievance (Martin Dep. 44:14-44:16). Bill Martin, a vice president of Local 75, also asked Huffman and Huffman's supervisor why Tarochione was fired but was given only answers along the lines that Tarochione was not "cutting it" (P. Resp. Ex. 3; Martin Dep. 30:17-31:1). On February 19, 2013 Tarochione filed this lawsuit against both Local 75 and Roberts. Tarochione later voluntarily dismissed her complaint as to the union pursuant to a settlement agreement (see Dkt. 45), several months before the depositions of union officials Dietz and Martin were conducted.

## Legal Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants (here Tarochione) and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir.2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir.2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## Disability Discrimination

Even though Tarochione's Complaint demanded relief under the ADA, Roberts correctly points out that she did not contest Roberts' motion for summary judgment on the question of

ADA liability (D. Repl. Mem. 2). But because summary judgment cannot be granted by default (see the Advisory Comm. on Civil Rules' Notes on Rule 56's 2010 amendments, in this instance as to Rule 56(e)), this opinion must still inquire into whether Roberts has succeeded in showing that there is no dispute of material fact such that it is entitled to a judgment as a matter of law.

Employers such as Roberts are bound by the ADA not to "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . job training, and other terms, conditions, and privileges of employment" (Section 12112(a)). "Disability" has a few possible definitions under the ADA, two of which are relevant here: "a physical or mental impairment that substantially limits one or more of the major life activities" or "being regarded as having such an impairment" (Section 12102(1)(A) and (C)).

Roberts is entitled to summary judgment on the question of ADA liability. All of the record (including Tarochione's own testimony) makes it clear that by the time she was working for Roberts her shoulder had completely healed and did not limit any of her major life activities (D. St. Ex. L; Tarochione Dep. 17:1-17:18). Thus Tarochione's ADA claim could potentially succeed only under the theory that Roberts regarded her as disabled. But Tarochione admitted that Huffman made his decision to fire her before Tarochione disclosed her history of shoulder replacement to the rest of the digging crew (P. Resp. St. ¶ 45). Obviously Roberts could not have fired Tarochione discriminatorily on the basis of a "regarded as" disability when it undisputedly did not regard her as disabled at the time it decided to fire her. Accordingly Roberts is entitled to judgment as a matter of law on the question of ADA liability.

## Sex Discrimination

More significantly, Tarochione has also charged that Roberts discriminated against her on the basis of sex in violation of Title VII. Thus she specifically asserts (1) that her opportunity to

succeed on the job was sabotaged by male co-workers who kept her from using necessary power tools, (2) that she was fired despite the fact that she performed her job duties adequately on those few occasions when her male co-workers did not so interfere and (3) that a sex-based discriminatory animus motivated both the interference and the firing. Roberts counters that Tarochione was fired for the simple reason that she did not perform her duties adequately, a deficiency that caused safety risks.

Title VII imposes liability on employers who "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex" (Section 2000e–2(a)(1)). Plaintiffs can show such discrimination through either the direct method or the indirect method of proof (Coleman v. Donahoe, 667 F.3d 835, 845 (7th Cir. 2012)). Tarochione contends that she can make out a claim of sex discrimination under either method. This opinion, however, will view the facts Tarochione has asserted only through the lens of the indirect method of proof because Tarochione clearly survives summary judgment under that approach. By contrast, an examination of Tarochione's claim under the direct method would involve difficult questions that need not be resolved here.[8]

_____

[8] Specifically, this Court would first need to decide whether to consider an event Tarochione described in her deposition but that neither party discussed: the teasing incident in which Sharrard and Huffman remarked that due to Fay's wife's extreme jealousy Fay would have to quit if Tarochione kept working (despite Tarochione's lack of any personal intimacy with Fay; see Tarochione Dep. 64:15-64:21). That teasing incident apparently occurred on the very day Huffman (with Sharrard's input) decided to fire Tarochione. If a desire to protect Fay from marital strife did motivate Tarochione's firing (something on which this Court expresses no opinion), it would raise the question whether employers discriminate "because of . . . sex" (Section 2000e-2(a)(1)) when they fire a female employee so as not to arouse the unfounded generalized jealousy of a male employee's spouse. To this Court's knowledge no court with precedential authority has ruled on the question, though dicta in several cases suggest that facts

(continued)

To survive summary judgment through the indirect method of proof, a Title VII plaintiff need only meet the familiar requirements of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Coleman</u>, 667 F.3d at 845 (citations and internal quotation marks omitted) has recently restated how those requirements apply in cases of adverse employment action, as distinguished from cases of involving harassment, a failure to promote or retaliation:

> To establish a prima facie case of discrimination a plaintiff must offer evidence that: (1) she is a member of a protected class, (2) her job performance met the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff. Once a prima facie case is established, a presumption of discrimination is triggered. The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its action. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful discrimination.

In the context of employment discrimination a "pretext" is any dishonest explanation (<u>Kulumani v. Blue Cross Blue Shield Ass'n</u>, 224 F.3d 681, 685 (7th Cir. 2000)). It is the fact that the employer is or may be lying about its real reason for taking adverse action against the plaintiff that gives rise to an inference that the real reason for that adverse action is illegal discrimination (see <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147-48 (2000)). Hence a showing of pretext will defeat an employer's motion for summary judgment (see, e.g., <u>Allen v. Chicago Transit Auth.</u>, 317 F.3d 696, 699 (7th Cir. 2003), which also collects cases standing for the same principle).

_____

(footnote continued)
along the lines Tarochione has put forward would indeed make out a claim of sex discrimination (e.g., <u>Platner v. Cash & Thomas Contractors, Inc.</u>, 908 F.2d 902, 905 n.5 (11th Cir. 1990); <u>Nelson v. James H. Knight DDS, P.C.</u>, 834 N.W.2d 64, 71 (Iowa 2013).

**Dietz's Affidavit**

Before this opinion can address the substance of Roberts' motion and Tarochione's response invoking the indirect method of proof, however, it is necessary to decide an evidentiary matter: Roberts has asked this Court to strike -- or at least to disregard -- the Dietz affidavit (D. Mem. 4-9). During his deposition Dietz repeatedly made it clear that he has almost no current recollection of the events at issue in this case, which means that he cannot now testify to the facts underlying most of the statements in his affidavit (e.g., Dietz Dep. 48:20-48:21). Roberts counters with a "gotcha!" position -- it argues essentially that Dietz's present inability to testify unmoors the factual statements in the affidavit from Dietz's personal knowledge, which in turn knocks the affidavit out of compliance with Rule 56(c)(4) and makes it unsuitable for consideration by this Court on a motion for summary judgment.

But although an affidavit in form, in substance Dietz's written statement is plainly a recorded recollection that is admissible under Fed. R. Evid. 803(5). Despite Roberts' efforts to mischaracterize Dietz's deposition testimony as a renunciation of the earlier affidavit, all Dietz said there (again and again) was that he no longer remembered the events about which he attested in the affidavit. As stated earlier, he stated that he had reviewed the affidavit before signing it and that his memory was fresher when he signed the affidavit (Dietz Dep. 61:8-61:11).

That alone suffices to meet the literal provisions of Fed. R. Evid. 803(5), but there are other indicia of reliability that support admission of the affidavit as well: Dietz still remembers at least some of the events described in the affidavit (such as Huffman's phone call to him telling him Tarochione had been fired, see Dietz Aff. at ¶ 9; Dietz Dep. 51:16-52:21), and the affidavit largely accords with facts recounted both in Tarochione's sworn deposition testimony and in a

contemporaneous letter from Local 75 vice-president Martin (P. St. Ex. 3), matters that this Court can properly consider under Fed. R. Evid. 104(a).

Furthermore, the inferences one can draw from Dietz's stated memory loss may well cut both ways. True enough, a factfinder might infer from it that the affidavit's statements are untrue: Dietz, a onetime steward for Local 75 (D. St. ¶ 14), could have asserted memory loss because that would be less harmful to Local 75 member Tarochione than an outright renunciation of the affidavit. But it could just as readily be inferred from Dietz's memory loss that the affidavit's statements are <u>true</u>: Roberts is a company that regularly contracts with Local 75 and hires Local 75 members on its projects (see Martin Dep. 21:16-21:21), and so Dietz might have had an incentive to overstate his memory loss to soften the blow that his earlier affidavit must land on Roberts' interests in this case. What controls here is that in the current context of Roberts' summary judgment motion this Court is of course obliged to draw the latter inference, which cuts in favor of Tarochione.

Finally, despite Dietz's less than ringing endorsement of his recorded recollection during his deposition, our Court of Appeals has upheld decisions to admit recorded recollections in even less certain circumstances (e.g., <u>United States v. Lewis</u>, 954 F.2d 1386, 1393-94 (7th Cir. 1992)). In sum, Dietz's affidavit is plainly admissible under Fed. R. Evid. 803(5), buttressed as well by the Fed. R. Evid. 807 residual exception on trustworthiness grounds.

It is thus apparent that Roberts' request that this Court strike or disregard the affidavit is misplaced. Because the affidavit is admissible evidence, the proper inquiry under Rule 56(c)(4) cannot be whether Dietz can currently testify about events that he once remembered but has now forgotten. Any such inquiry would lead to the perverse result that evidence admissible at trial (a recorded recollection) could not be considered on summary judgment. Instead the proper inquiry

under Rule 56(c)(4) must be whether Dietz can testify, based upon personal knowledge, that the affidavit indeed reflects a prior recollection. That he can clearly do. Hence this opinion will consider the statements in Dietz's affidavit as a proper part of the record on Roberts' present motion for summary judgment.

**Indirect Method of Proof: Prima Facie Case**

Tarochione's factual assertions make out a prima facie case of sexual discrimination, meeting each of the four <u>Coleman</u>-restated elements: She is a member of a protected class, her job performance met the employer's legitimate expectations, she suffered an adverse employment action and similarly situated individuals not in the protected class were treated more favorably than she. As for the first element, of course, women are a protected class under Title VII, but the remaining three elements require more than mere tautology.

Most central to Tarochione's claim of sex discrimination is the second component of the prima facie case: whether she was meeting legitimate employer expectations. As will be seen, the resolution of that question affects not just the issue of pretext[9] but also the question whether there were any similarly situated employees. Tarochione and Roberts disagree as to whether she was meeting legitimate employer expectations. Roberts contends she was not -- it points to the deposition testimony from Huffman, Fay, Sharrard and Donald Ropp (a machine operator at the same worksite) that she could not control the air spade and tamper jack and dug too often with her hands, creating a safety risk (D. St. ¶¶ 24-40). As stated earlier, Tarochione asserts essentially that Huffman, Fay, Sharrard and Ropp are either lying or overstating things, because

_____

[9] Our Court of Appeals has remarked several times on the link between the legitimate employer expectations element of the prima face case and the pretext question (see, e.g., <u>Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't</u>, 510 F.3d 681, 687-88 (7th Cir. 2007)).

she used the tools competently on the few occasions she was allowed to use them at all, and she dug with her hands only when proper (P. St. ¶¶ 12-18).

For that assertion Tarochione relies not just on her own opinion of her work -- she marshals testimonial and circumstantial evidence as well. Dietz attested that Tarochione's work was "equally as good as" the male laborers' (Dietz Aff. ¶ 9). Sharrard commented to Tarochione a few days before she was fired that she was doing "a really good job" (Tarochione Dep. 38:18-38:19). Tarochione attested to her own history of performing similar work at a high level, which tends to cast doubt on the idea that she had somehow become physically incapable of such work (id. 58:15-58:18), especially considering that she undisputedly suffered from no disability. Tarochione also stated that none of Huffman, Sharrard or Fay[10] ever criticized her work while she was on the job or told her that she was operating the power tools unsafely (id. at 38:13-38:22; 69:13-69:15). Tarochione also points to other evidence that is inconsistent with the picture that Roberts, and especially Sharrard, attempt to paint of a worker who was given training in the use of every tool but just could not perform: Tarochione states she did not use the air spade at all (id. at 26:20-27:1), that Fay allowed her only 10 minutes with the tamper jack before taking it away (id. at 28:14-28:16) and that for a time she was even prevented from using a small torch (id. at 27:10-27:15), a tool that neither Huffman nor Sharrard nor Fay ever said Tarochione was incapable of handling.

Clearly there is a factual dispute as to whether or not Tarochione was meeting legitimate employer expectations. Perhaps a jury would add up the number of witnesses and credit the

_____

[10] Tarochione and Roberts dispute whether Fay or Sharrard was the "lead man," "lead laborer," "competent person" or "straw boss" of the digging crew (P. Resp. St. ¶ 11).

story told by four rather than the story told by two, or it might perhaps choose to discredit Dietz's recorded recollection. But weighing the evidence is a task that belongs exclusively to a finder of fact, not to a court considering a motion for summary judgment (see Lewis v. City of Chicago, 496 F.3d 645, 651 (7th Cir. 2007)). So it would be inappropriate to grant summary judgment on the question whether Tarochione met legitimate employer expectations.

That moves the analysis to the third element -- the question whether Tarochione suffered an adverse employment action. On that score the parties do not contest the issue as such, but some of Roberts' assertions necessarily entail the view that Tarochione suffered only one adverse employment action: her firing. For example, Roberts asserts that only Huffman's discriminatory intent vel non is relevant to the instant motion because Huffman alone made the final decision to fire Tarochione (D. Repl. Mem. 9). But as has just been set out, Tarochione has put forward not only that she was fired but also that her direct supervisor prevented her from using tools necessary for the job, including but not limited to the tamper jack. Workers who used the tamper jack received a higher rate of pay (Huffman Dep. 25:2-25:23).

As Hicks v. Forest Pres. Dist. of Cook County, Ill., 677 F.3d 781, 787 (7th Cir. 2012) (citations and internal quotation marks omitted) has stated:

> To establish that a materially adverse employment action has been taken, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse.

Hicks goes on to quote Tart v. Ill. Power Co., 366 F.3d 461, 475 (7th Cir. 2004) for the proposition that reductions in "compensation, benefits or other financial terms of employment" typically qualify as materially adverse employment actions. And Tart, id., is among the cases that amplify the "materially adverse" concept to include changes in one's working environment that a reasonable employee would consider "humiliating, degrading, unsafe, unhealthful or

- 14 -

otherwise significantly negative" (having one's desk moved to a closet being the classic example).  Because use of the power tools was a job requirement (Sharrard Dep. 47:1-47:8), a reasonable employee would indeed find it "humiliating, degrading" and "significantly negative" to have such use totally denied.  Furthermore, because the tamper jack carried a higher rate of pay, Sharrard's (or Fay's) decision to forbid Tarochione from using the jack diminished her compensation.  Thus Tarochione has produced facts sufficient to show that she suffered two adverse employment actions:  being denied the use of necessary tools and being fired.

Finally, Tarochione and Roberts dispute whether there was a similarly situated male worker who was treated more favorably -- the fourth part of the McDonnell Douglas prima facie case.  Roberts argues that there are no male employees situated similarly to Tarochione because she was the only member of the digging crew who had never worked on an integrity dig before (D. Mem. 6).  Tarochione, relying on Eaton v. Ind. Dep't of Corrections, 657 F.3d 551, 559 (7th Cir. 2011), counters that her experience level is irrelevant because "similarly situated" means similarly situated in respect to only those factors that an employer took into account when it decided to take the adverse action against a plaintiff (P. Mem. 10).  Because there is no evidence that Huffman, Sharrard or Fay denied Tarochione the use of power tools or fired her because of her lack of integrity dig experience per se, all of the male laborers on the digging crew -- all of them being persons who performed the same work under the same conditions as Tarochione -- were similarly situated to Tarochione (id.)

Tarochione has the better of the argument.  Here as in Eaton Roberts "repeatedly took the position . . . that the only basis for the decision to terminate" Tarochione was that her work performance was so poor that it posed a safety risk (Eaton, 657 F.3d at 559).  At no time did

Huffman, Fay or Sharrard consider Tarochione's lack of experience in and of itself (i.e., unrelated to the question of job performance and safety). As <u>Eaton</u>, <u>id.</u> further explained:

> A characteristic that distinguishes two employees, regardless of its significance when objectively considered, does not render the employees non-comparable if the employer never considered that characteristic.

While of course experience is significant "when objectively considered," that is mainly because it shares an intuitive link with job performance. But here it must be remembered that Tarochione has produced sufficient evidence to support a finding that her job performance was <u>actually adequate</u> -- or at the least, would have been so absent Sharrard's and Fay's actions that Tarochione says unfairly undermined her work. So in light of the reasons Roberts proffered for taking adverse employment action against Tarochione, all three of the other laborers on the digging crew (Fay, Sharrard and Dietz) were "directly comparable to [Tarochione] in all material respects" (<u>Eaton</u>, <u>id.</u>, quoting a common formulation).[11] And so Tarochione has made out the fourth and final element of the prima facie case as well.

**Legitimate, Non-Discriminatory Reason and Pretext**

Roberts has come forward with a legitimate, non-discriminatory reason for taking adverse employment action against Tarochione. Both Sharrard and Fay attested during their depositions that Tarochione dug with her hands and was unable to control the tamper (Sharrard Dep. 38:6-38:7, 40:22-41:15; Fay Dep. 43:8-44:11). Sharrard also testified that she could not control the air spade properly (Sharrard Dep. 36:8-36:22). When Huffman fired Tarochione he said he

_____

[11] Even if this Court were to credit Roberts' contention that Tarochione's work posed a safety risk, on that score Fay would likely be similarly situated to Tarochione -- he was not denied use of the tools or fired despite (so Tarochione asserted) reporting to work drunk (Tarochione Dep. 86:17-86:21). Working on an oil pipeline while intoxicated of course presents a safety risk of the highest order -- indeed, the Department of Transportation expressly forbids it (see 49 C.F.R. §§ 199.3, 199.219).

did so because he had observed her using the tamper improperly and because Sharrard had reported to him that Tarochione was not using the equipment properly (Huffman Dep. 63:12-63:21; 78:1-78:9). Each of Dietz and Martin reported that the reason Huffman gave for firing Tarochione was that she was not "cutting it," although Martin was uncertain of the exact words Huffman used (P. St. Ex. 3; Martin Dep. 30:19-30:24).

If Tarochione can come forward with evidence to support a finding that those reasons are a mere pretext, her claim of discrimination survives summary judgment. Pretextual reasons are simply false reasons -- that is, lies (Coleman, 667 F.3d at 852). To show pretext Tarochione "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the [employer's] asserted reason that a reasonable person could find it unworthy of credence" (id., internal punctuation and citation omitted). But if Roberts can show that it "honestly believed" its proffered reason that Tarochione's work was unsatisfactory and posed a safety hazard, Tarochione's attempt to show pretext would fail (id. at 853).

Tarochione wins that contest at this stage of the case, for she has come forward with enough evidence to permit a finder of fact to conclude that Fay's and Sharrard's proffered non-discriminatory reasons for taking adverse employment action against her (by denying access to tools and, in Sharrard's case, by recommending that she be fired) are pretexts. First and most obviously, she has produced evidence sufficient to support a finding that her work performance was actually satisfactory. As described in this opinion's discussion of the second element of the prima facie case, the Dietz affidavit supports a finding that Tarochione's work was indeed satisfactory, as does the fact that (according to Tarochione) no one ever complained to her about or corrected her work, and also as does Sharrard's comment to Tarochione that she was doing a "good job."

While a simple showing that her work performance was satisfactory might not suffice to show pretext on its own (because Sharrard and Fay might have honestly but mistakenly believed that her performance was poor), Tarochione has also averred -- without contradiction -- that she was given almost no access to tools in the first place. It should be recalled that she attested that she used the tamper for only 10 minutes, she never used the air spade and she was temporarily denied the use of the torch, which no one said she used inappropriately. That is in stark contrast to Sharrard's testimony especially, in which he described her misusing the air spade, made no mention of the torch and portrayed himself as offering her patient training in the use of the power tools (Sharrard Dep. 61:6-62:1) -- training that, again, Tarochione said she never received. In short, Tarochione's testimony flatly contradicts Sharrard's as to what happened on the job site, which of course permits an inference that Sharrard is lying. And that is certainly enough to support a finding of pretext.

As for Huffman's stated reason for firing Tarochione, it is true that his statement to Dietz at the time of firing (that Tarochione was not "cutting it") seems to mean that he thought her unable to perform the work competently, and thus the reason he gave at the time of firing is at least consistent with his deposition testimony. But his inability to give details about what was wrong with Tarochione's work at the time of firing despite being asked to do so, as contrasted with his cogent explanation during his deposition of the safety risks posed by Tarochione's job performance, would tend to support a finding that Huffman originally gave a vague reason to cover up a discriminatory reason (see Culver v. Gorman & Co., 416 F.3d 540, 549 (7th Cir. 2005)). In any case, though, even if Huffman honestly believed that Tarochione's work performance was unacceptable, his decision to fire her was substantially based on Sharrard's recommendation, whose good faith has been called into material doubt. That makes Huffman's

- 18 -

decision vulnerable to attack on a "cat's paw" theory of liability as that concept has been cabined in Staub v. Proctor Hosp., --- U.S. ---, 131 S.Ct. 1186, 1193 (2011). Smith v. Bray, 681 F.3d 888, 897 (7th Cir. 2012) has since reconfirmed our Court of Appeals pre-Staub application of the theory in the same terms:

> As applied in this circuit, "cat's paw" liability may be imposed on an employer where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.

Here Sharrard undisputedly provided "factual information or other input" that affected Huffman's decision to fire Tarochione. So Tarochione's showing of pretext as to Sharrard suffices for both adverse employment actions about which she complains -- not only being denied access to tools, but being fired as well.

In sum, Tarochione has brought forward enough evidence to permit a finding that Roberts' proffered reasons for taking adverse employment action against her are pretexts. That permits an inference of discrimination, and so "there must be a trial" (Mills v. Health Care Serv. Corp., 171 F.3d 450, 458 (7th Cir. 1999)).

## Conclusion

For the foregoing reasons, Roberts' motion for summary judgment is granted as to Tarochione's claim under the ADA and denied as to Tarochione's claim under Title VII. All parties are ordered to appear for a status conference at 9:15 a.m. on December 10, 2014 to discuss the timing and procedures for moving the case forward as to the issues that remain unresolved.

_____
Milton I. Shadur

Date: December 3, 2014          Senior United States District Judge

- 19 -